869 F.2d 1492
 Unpublished Disposition
John PEROTTI, Plaintiff-Appellee, Cross-Appellant,
v.
Richard SEITER, et al., Defendants,
Gary Brown, Defendant-Appellant, Cross-Appellee.
 Nos. 87-3532, 87-3533.
 United States Court of Appeals, Sixth Circuit.
 Feb. 16, 1989.
 
 Before KENNEDY, RALPH B. GUY, Jr. and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Defendant Gary Brown appeals and plaintiff John Perotti cross-appeals from a judgment following a jury verdict awarding the plaintiff compensatory and punitive damages totaling $2,000 in a suit alleging that prison officials violated Perotti's civil rights by subjecting him to cruel and unusual punishment in violation of the eighth amendment to the United States Constitution. Appellant Brown argues that the jury's verdict is against the weight of the evidence, that each defendant acted reasonably under the circumstances and was therefore immune from liability, and that the district court erred by failing to give jury instructions on medical probability and causation. Cross-appellant Perotti argues that the district court erred in admitting evidence of his disciplinary record in the Ohio Correctional System.
 
 
 2
 We conclude that defendant Brown's arguments are meritless and that, although the court erred in admitting evidence of Perotti's prison disciplinary record, the error was harmless. We therefore affirm the judgment of the district court.
 
 I.
 
 3
 John Perotti brought this action against the Director of the Ohio Department of Rehabilitation and Corrections and twelve Southern Ohio Correctional Facility ("SOCF") officials while Perotti was an inmate at the facility. He based his claim on 42 U.S.C. Sec. 1983, alleging that prison personnel beat him on three separate occasions, thereby subjecting him to cruel and unusual punishment in violation of the eighth amendment. The district court dismissed claims against six of the defendants prior to trial. A jury eventually found in favor of all but one of the remaining defendants. It held SOCF Correctional Officer Gary Brown liable for $1,000 compensatory damages and $1,000 punitive damages. Brown moved for judgment notwithstanding the verdict, and both he and Perotti moved for a new trial. The district judge denied all post-verdict motions and this appeal followed.
 
 A.
 
 4
 Perotti's claims involved beatings that occurred at the SOCF on three separate occasions in 1983. The defendants admitted using force against Perotti on each occasion, but argued that the force was made necessary by Perotti's unruly behavior and, in all events, was reasonable under the circumstances.
 
 1.
 
 5
 The first incident occurred on January 8, 1983. Perotti testified that on that morning he slipped on a bar of soap while showering and injured his back. He claimed that after complaining of pain he was taken by correctional officer Williams to the infirmary while seated in a wheelchair and restrained in handcuffs. Perotti claimed that two other officers, Swan and Hall, joined him and Williams in an elevator, and that when the elevator doors closed the three officers began to beat him without provocation.
 
 
 6
 The defendants' testimony was very different. They claimed that Perotti expressed extreme displeasure at being required to go to the infirmary, and resisted the officers' efforts to take him there by kicking and hitting them and using profanity. The officers claimed they were required to use force to subdue and restrain Perotti who was "out of his head," and smelling of alcohol. As a result of the injuries received during the January altercation, Perotti was hospitalized for thirty days at the prison infirmary. His injuries included passing blood in his urine, bruising over the entire body, and a "golf ball size lump" on his leg, and a permanent leg scar.
 
 2.
 
 7
 The second incident occurred on March 14, 1983. Perotti testified that on that morning, while in the 42nd day of a hunger strike, he failed to receive his prescribed medication and complained of chest pain. He was taken to the infirmary in handcuffs and leg irons, but was told that he would have to wait until the afternoon for medication. He testified that when he protested, defendant Wente was called, and then, without provocation, defendants Wente, Lynn, and Brown, and two other officers dragged Perotti by the leg irons out of the infirmary, down a hall, and into a holding cell, kicking and beating him along the way. In the holding cell, Perotti lit a cigarette, which was forbidden by prison rules, and refused to put it out. Defendant Wente put it out with a chemical fire extinguisher. Perotti testified that he lit another cigarette which Wente again extinguished by spraying the entire contents of the chemical extinguisher in Perotti's face.
 
 
 8
 Again, the defendants' version of the events of March 14 differed sharply from Perotti's. The defendants claimed that whatever force they used was necessary because Perotti refused to leave the infirmary and violently resisted the officers efforts to remove him. They claimed that in light of Perotti's violent temperament, the fire extinguisher was a reasonable means of enforcing the institution's smoking rules, and that no chemical was sprayed in Perotti's face.
 
 
 9
 After a cooling-off period, one of the defendants brought a wheelchair to be used in returning Perotti to his cell. Perotti testified that two of the defendants forced him to sit in the wheelchair, handcuffed him to it, and, without provocation, struck him about the head and chest with an officer's baton. Thereafter, according to Perotti, he was "dumped ... on the floor, ... dragged by leg irons into a 'strip cell,' and beaten with sticks."
 
 
 10
 The defendants testified that Perotti resisted being seated in the wheelchair, struck and kicked the officers, and resisted being placed in his cell. They testified that Perotti's violent resistance necessitated the use of force to subdue and confine him.
 
 3.
 
 11
 The third incident occurred the following day, March 15, 1983. Perotti was once again taken by wheelchair to the prison hospital, this time to have his injuries from the previous day examined. After x-rays were taken, he was released to return to his cell. Perotti claimed that he told defendant Brown that he was too weak to walk back to his cell and requested a wheelchair. Brown refused Perotti's request. Brown testified that Perotti then raised his handcuffed wrists in a threatening manner. With his left hand Brown grabbed Perotti by the handcuffs he wore, and with his right hand Brown hit Perotti in the head. Brown was holding a second pair of handcuffs in his right hand when he struck Perotti.
 
 
 12
 Perotti was then returned to the infirmary in order to have the injury to his head examined. Although the versions of the respective parties as to what occurred next differ, it appears that while awaiting treatment at the infirmary, Perotti threw a metal tray at Brown and Brown responded by throwing a telephone at Perotti. A general melee ensued in which Perotti, two defendants, and two other correctional officers were wrestling on the floor. When Perotti was finally subdued, he was placed on an examination table and his injuries were examined by a prison nurse who ordered that he be taken to a nearby hospital. Perotti told Brown that he was unable to walk to the van that was to transport him the hospital. Brown, on the other hand, claimed that Perotti was unwilling to walk to the van. It appears to be undisputed that Brown and another guard then dragged Perotti in handcuffs, leg irons, and a belly chain "like a sack of potatoes" several hundred feet along a "smooth hard floor" to the stairs leading to the van. Brown testified that he and two correctional officers attempted to carry Perotti down the stairs to the van but when Perotti resisted they dropped him and he slid down the steps. Brown indicated that several of the guards then helped Perotti into the van. Perotti testified that the defendants dragged him, head bouncing, down the steps, and threw him into the van "like a sack of potatoes." Perotti claimed that this two-day beating ordeal caused severe lacerations on his head, a bloody face and mouth, and a back so sore that he was unable to straighten up.
 
 B.
 
 13
 During Perotti's cross examination, the trial court admitted, over his counsel's timely objections, testimony and reports concerning Perotti's disciplinary records at SOCF and other penal institutions. Some of the disciplinary violations were more than ten years old. The evidence indicated that Perotti had been disciplined for the possession of a knife, use of alcohol and marijuana, and for fighting with inmates and guards. Perotti argues that the court should not have admitted the evidence because it was unfairly prejudicial to him and not relevant to any defense of the defendants.
 
 
 14
 We shall address first the issues raised by defendant Brown's appeal, and then turn to plaintiff Perotti's cross-appeal.
 
 II.
 
 15
 The standard applicable to appellate court review of a trial court's decision granting or denying a motion for judgment notwithstanding the verdict is the same standard that binds the trial court, Morelock v. N.C.R. Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906 (1979). It is that a court may grant a j.n.o.v. only when the evidence properly "viewed in the light most favorable to the party against whom the motion is made, drawing from the evidence all reasonable inferences in his favor," points so strongly in favor of the moving party that reasonable minds could not conclude otherwise. Ratliff v. Wellington Exempted Village Schools Bd. of Educ., 820 F.2d 792, 795 (6th Cir.1987); accord, Ivey v. Wilson, 832 F.2d 950, 953 (6th Cir.1987).
 
 A.
 
 16
 The conclusion that a reasonable minded juror must have been able to draw in order to have been justified in finding that the prison officials' conduct in this case violated the eighth amendment is set forth in Whitley v. Albers, 475 U.S. 312 (1986). Whitley holds that "the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." 475 U.S. at 320.
 
 
 17
 Although the jury would have been warranted in concluding that Perotti was beaten on three different occasions, only the March 15 incident involved Brown. Even if we limit our review to Brown's actions on March 15, however, after viewing the evidence in a light most favorable to Perotti, as indeed we must, we are not left with the conviction " 'that there is a total failure of evidence to prove the plaintiff's case.' " Ivey v. Wilson, 832 F.2d 950, 953 (6th Cir.1987) (quoting Fact Concerts, Inc. v. City of Newport, 626 F.2d 1060, 1064 (1st Cir.1980), vacated on other grounds, 453 U.S. 247 (1981)). Rather, a jury could reasonably have concluded from the evidence that on that date Brown's actions were not taken solely "in a good faith effort to maintain or restore discipline" but included a malicious purpose to inflict harm. Throwing a telephone at a prisoner, for example, is not done as part of a good faith effort to maintain or restore discipline. Evidence also indicated that the beatings inflicted upon Perotti, and the resultant injuries, were wholly disproportionate to what was necessary to "maintain or restore discipline." For example, although Brown testified that the handcuffs he was carrying when he struck Perotti were only being carried to restrain Perotti, a reasonable juror could have found that the handcuffs were intended to be used and were used as a weapon since Perotti was already restrained by handcuffs and leg irons. Moreover, in testimony the jury was entitled to credit, Perotti stated that Brown reached for the extra handcuffs just prior to striking Perotti with them. Finally, even Brown admitted to dragging Perotti, handcuffed and chained, several hundred feet down a hall "like a sack of potatoes," despite the fact that Perotti was over forty days into a hunger strike and suffering from a head injury. Brown indicated that while wheelchairs were available, he did not wish to appease Perotti. Based on this evidence we are satisfied that the evidence of Brown's actions, much of which was undisputed, does not fall within the protection that Whitley affords prison officials.
 
 B.
 
 18
 Brown also argues that his actions were protected by the defense of qualified good faith immunity as set out in Harlow v. Fitzgerald, 457 U.S. 800 (1982), in which the Supreme Court declared:
 
 
 19
 We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 20
 457 U.S. at 818 (emphasis added). Brown argues that the standard for determining whether a prison official's actions violate the eighth amendment was not clearly established until Whitley, which was decided some three years after the beatings in this case.
 
 
 21
 Perotti argues, and we agree, that Whitley pronounced no new law respecting the use of force by prison authorities against inmates in keeping order or with respect, generally, to the traditional and clearly established constitutional standards governing the duty of prison officials to refrain from imposing cruel and unusual punishment upon inmates in their care. Indeed, Whitley relied upon Ingraham v. Wright, 430 U.S. 651 (1977), which in turn relied upon Estelle v. Gamble, 429 U.S. 97 (1976), for the proposition that "[a]fter incarceration, only the 'unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment.' " 430 U.S. at 670 (quoting Estelle, 429 U.S. at 103). The rule of Whitley, that "whether the measure taken inflicted unnecessary and wanton pain and suffering turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the purpose of causing harm," is no more than a specific articulation of the general standard of Estelle and Ingraham that was "clearly established" before the incidents in this case occurred.
 
 
 22
 But even if it were not, we would decline to resolve Brown's appeal on his qualified immunity argument, because he has waived the defense by failing to raise it and obtain a ruling upon it below. Although mentioned in the defendant's answer, the qualified immunity defense was never asserted by motion of summary judgment or even by a request for a jury instruction at trial. As a result, the district court was not asked to rule and did not rule upon the point, and thus there is no district court decision on the issue for us to review.
 
 C.
 
 23
 Finally, Brown argues that the district court erred and the jury improperly awarded damages because the court failed to instruct the jury on the issue of "medical probability and causation" with respect to Perotti's claim of back injuries. But neither Brown nor any other defendant objected to the court's jury instructions on causation. When the parties were discussing the issue of jury instruction in chambers, counsel for the defendants requested an instruction on "reasonable medical probability," to which the district court replied: "I think we've got an instruction on proximate cause in here." Defendants' counsel responded, "Okay" and moved on to another subject. Read in context, defendant's counsel's colloquy with the trial court cannot be reasonably taken to mean anything other than acquiescence in the court's intention to instruct on proximate cause. Counsel registered no objection to the court's refusal to charge on "reasonable medical probability" either before or after the charge was given, submitted no proposed text for such an instruction, and did not object to the sufficiency of the court's proximate cause instruction. In all events, there was an abundance of evidence from which the jury was entitled to conclude, without a physician's expert opinion testimony, that the beatings inflicted upon Perotti could proximately have resulted in the back and head injuries he claimed to have suffered.
 
 III.
 
 24
 Perotti's claim on cross-appeal is that the district court erred in admitting evidence of his past disciplinary record within the correctional system. He argues that the introduction of his prison disciplinary record was unfairly prejudicial and irrelevant to the defense of his claim. Perotti filed a motion in limine requesting exclusion of this evidence but, based upon Whitley, the trial judge denied the motion because in Whitley the Supreme Court indicated that any reasonably perceived factors that indicate the nature of the threat posed by the prisoner to staff and other inmates are relevant to the defense of a prisoner's eighth amendment claim against prison officials. A guard's knowledge of a prisoner's prior disciplinary record for unruly, disruptive, assaultive, or violent behavior would be such a factor. In this case, however, the defense introduced no evidence that any of the guards knew of Perotti's prison discipline record.
 
 
 25
 That being so, the evidence cannot have been probative of the defendants' state of mind concerning Perotti's history of disruptive behavior and resistance to the lawful orders of prison guards. We agree with Perotti that Whitley fails here to support the admission of the evidence to which he objected. We likewise agree that the defendants' argument that the evidence was properly admitted pursuant to Fed.R.Evid. 406 as evidence of Perotti's "habit" for breaking disciplinary rules is wholly meritless. It appears that the real reason the defendants introduced the evidence was to show that because Perotti had a history of violating prison rules and regulations, he probably precipitated the events in question, and that is a purpose clearly violative of Rule 404's prohibition against the use of character evidence to prove conduct in conformance therewith. Nevertheless, for two reasons we find that the introduction of this "bad character" evidence "affected ... [no] substantial right[s]" and was harmless error. See, Fed.R.Evid. 103(a).
 
 
 26
 First, after eliciting the evidence of Perotti's prison disciplinary record on cross-examination early in the trial, defense counsel practically abandoned the subject. He did not dwell on the inadmissible evidence during his closing argument but focused on the nature of the institution to which Perotti was confined, and Perotti's credibility.
 
 
 27
 Second, the jurors awarded Perotti compensatory damages for the injuries that he was able to prove, and, in addition, punitive damages. Thus, it appears that despite the improper evidence, the jury did not choose to adopt the defendants' trial theory that because Perotti was previously a "bad actor" he was also the aggressor on the three occasions involved in this case, or that, in view of Perotti's history, Brown's use of force was reasonable under the circumstances.
 
 
 28
 AFFIRMED.