**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION,**
Respondent,

SouthRail Corporation, Intervenor.

No. 89–3918.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1990.

Decided July 31, 1990.

John O'B. Clarke, Jr., Donald F. Griffin (argued), Richard S. Edelman, William G. Mahoney, Highsaw & Mahoney, Washington, D.C., for Brotherhood of Locomotive Engineers and Railway Labor Executives' Assn.

Robert S. Burk, Virginia Strasser (argued), I.C.C., Office of the Gen. Counsel, Washington, D.C., for I.C.C.

John J. Powers, III, Robert J. Wiggers, U.S. Dept. of Justice, Antitrust Div., Cathrine G. O'Sullivan, U.S. Dept. of Justice, Antitrust Div. Appellate Section, Washington, D.C., for U.S.

Christopher Eric Hagerup, Kimberly A. Madigan, Weiner, McCaffrey, Brodsky & Kaplan, Washington, D.C., for Southrail Corp.

Before MILBURN and NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.

MILBURN, Circuit Judge.

Petitioners are two unions with members formerly employed by the Gulf and Mississippi Railroad ("GMR"), which intervenor SouthRail Corporation acquired in 1988. Petitioners insisted below that SouthRail was a rail carrier when it acquired GMR, and, therefore, the ICC should have subjected the acquisition to regulation under 49 U.S.C. § 11343, which would have required SouthRail to guarantee job security for former GMR employees. However, the ICC determined that SouthRail was not a carrier, and it exempted the acquisition of GMR from strict regulation (and labor protective conditions) pursuant to 49 U.S.C. § 10901.

In this appeal, petitioners seek review of the ICC's refusal to revoke the exemption. For the reasons that follow, we affirm the ICC's decision and deny the unions' petitions for review.

## I.

### A.

Petitioners are the Brotherhood of Locomotive Engineers and the Railway Labor Executives' Association ("the unions"). Both unions represent former GMR employees who live in this circuit and have direct personal interest in the litigation.

MidSouth Corporation ("MidSouth") is a holding company. In the industry nomenclature, MidSouth is a "noncarrier"; i.e., not a rail carrier. MidSouth has three subsidiaries that are rail carriers: the MidSouth Rail Corporation ("MSRC"), the MidLouisiana Rail Corporation ("MidLou") and SouthRail Corporation. MidSouth, MSRC and MidLou are not parties in this litigation, while SouthRail is an intervenor. MidSouth and its subsidiaries share the same chairman of the board, president, and upper management personnel, all of whom work in the same location. MidSouth and its subsidiaries share the cost of these executives' salaries.

GMR operated 732 miles of track that stretched from Tennessee to Mobile, Alabama. In mid–1987 it was on the verge of bankruptcy, struggling with annual operating losses, in default on more than $20 million of loans, and with track in such poor shape that it limited trains to a maximum speed of ten miles per hour. Among GMR's creditors was the General Electric Capital Corporation ("G.E."), to which GMR owed approximately $17.5 million.

In November 1987, MidSouth and G.E. restructured GMR's debt into an obligation of approximately $12 million, of which MidSouth became the primary obligor on $1 million. MidSouth also formed SouthRail's corporate predecessor, SouthEastern Rail Corporation, which established lines of credit with various banks in Boston and New York City and the Federal Railroad Administration, and arranged the necessary financing for a $9–million rehabilitation program for GMR's track. SouthEastern Rail Corporation changed its name to the SouthRail Corporation in January 1988.

SouthRail and GMR executed an acquisition agreement on April 14, 1988. South-

Rail assumed all of GMR's assets and liabilities in exchange for $1.2 million of Mid-South common stock and warrants to purchase an additional 80,000 shares of Mid-South common stock in the five years after the deal closed. The purchase agreement provided that SouthRail could terminate the deal if it could not obtain an exemption from the ICC that would allow it to avoid having to guarantee job security for all of GMR's employees.

## B.

Under 49 U.S.C. sections 11343 and 11347, when a rail carrier acquires control over another rail carrier, the ICC must impose "protective labor conditions" upon the buyer. These conditions require the buyer to guarantee that the employees of the purchased carrier will "not be in a worse position related to their employment" for at least four years after the sale. 42 U.S.C. § 11347. Section 11343 also imposes protective labor conditions where the buyer is a noncarrier that already controls other carriers; *i.e.*, a holding company whose subsidiaries are rail carriers.

In this case, the ICC granted SouthRail an exemption that permitted it to avoid protective labor conditions. The exemption evolved in the following manner: The ICC is required under 49 U.S.C. § 10901 to approve and regulate the acquisition of rail carriers by noncarriers.[1] However, after Congress expanded the ICC's power to exempt various transactions from strict regulation, the Commission designated the acquisition of carriers by noncarriers to be a special class of transactions, and exempted the class from regulation under section 10901, provided that the noncarrier had been formed for a legitimate business purpose and not merely to avoid the obligation of protective labor conditions.[2]

To use a section 10901 class exemption a noncarrier must publish a notice in the *Federal Register* that (1) it plans to acquire a carrier, and (2) the acquisition falls within the class of transactions exempted from section 10901.[3] Parties opposed to the noncarrier's proposal must petition the ICC to revoke the exemption; otherwise, it goes into effect soon after publication of the notice.[4]

On December 4, 1987, SouthRail published its notice of intent to acquire GMR under a section 10901 class exemption. The unions responded by petitioning the ICC to revoke the exemption, insisting that section 11343 applied because SouthRail was a carrier. The parties engaged in seven months of discovery and then filed supplemental petitions and responses.

On August 15, 1989, the ICC issued a Decision and Order in which it denied the unions' petitions to revoke SouthRail's class exemption. The ICC found that: Mid-South formed SouthRail to acquire and operate GMR; MidSouth formed SouthRail for the legitimate business purpose of shielding itself and its subsidiaries from the financial risks involved in the acquisition of GMR; MidSouth did not financially guarantee SouthRail's performance; and SouthRail assumed nearly all of the financial risks involved in the acquisition. The ICC noted that SouthRail planned to publish its own tariffs, hire its own employees, and acquire its own operating material. The ICC concluded that SouthRail was an independent corporate entity entitled to noncarrier status.

In reaching its conclusion, the ICC rejected the unions' argument that MidSouth created SouthRail to evade the cost of protective labor conditions. The ICC acknowledged that SouthRail's agreement to buy GMR included provisions that allowed it to terminate the deed if it were denied a class exemption. But the ICC found that

> [t]he termination provisions were included in the purchase agreement because

1. See *Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901*, 1 I.C.C. 810 (1985), *aff'd sub nom. Illinois Commerce Comm'n v. ICC*, 817 F.2d 145 (D.C.Cir. 1987) (table) (hereinafter *"Class Exemption Case"*).

2. See *id.; see also* 49 C.F.R. §§ 1150.31–.35 (1989).

3. See 49 C.F.R. §§ 1150.32–.34.

4. See *id.* at 1150.34–.35.

labor protection costs were a material economic consideration to both sides. The parties were not seeking to avoid the cost; they just desired an opportunity to renegotiate the purchase price if the Commission determined that the acquisition was subject to section 11343. J.A. 18.

The proceedings pertaining to the ICC's regulation of SouthRail's acquisition of GMR are the "acquisition proceedings," as opposed to the "control proceedings," which were separate, related proceedings that concerned MidSouth's control of SouthRail. At approximately the same time that SouthRail filed its notice of exemption, MidSouth petitioned the ICC for an exemption pursuant to 49 U.S.C. § 10505 that would allow it to control SouthRail free from the ICC regulation which would otherwise have been required by section 11343.

On February 1, 1908, the ICC granted MidSouth's petition. However, section 11347 makes protective labor conditions mandatory for transactions subject to section 11343 regardless of whether they are exempted from that section's regulatory requirements. Accordingly, the ICC imposed protective labor conditions to protect the employees of SouthRail, MSRC and MidLou. The unions contested this decision before the Commission, arguing that section 11347 required it to impose the same protective labor conditions for employees of GMR, but the ICC disagreed because the GMR was not a party to the control proceeding. We affirmed in an unpublished opinion. *See MidSouth Corp.— Continuance in Control Exemption— SouthEastern Rail Corp.*, No. 31186 (I.C.C. February 12, 1988), *aff'd sub nom. Railway Labor Executives' Ass'n v. ICC*, 869 F.2d 1492 (6th Cir.1989) (table).

The principal issue presented in this appeal is whether the ICC properly denied the unions' petition seeking revocation of SouthRail's section 10901 class exemption.

## II.

### A.

■ In reviewing the ICC's decision, we must give considerable weight and due def-

erence to the Commission's interpretation of the statutes it administers unless its statutory construction is plainly unreasonable. *See K Mart v. Cartier, Inc.*, 486 U.S. 281, 291–92, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988); *Chevron, USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Our review of the ICC's factual findings is governed by the Administrative Procedure Act, which requires approval of the agency's findings unless they are arbitrary, capricious, an abuse of discretion, not in accordance with the law, or not supported by substantial evidence. *See* 5 U.S.C. §§ 706(2)(A), (E).

The unions first argue that the acquisition proceedings below were defective because MidSouth did not participate. They argue that because MidSouth, as a "parent" holding company, is acquiring control over a carrier (GMR) through a subsidiary it controls (SouthRail), it must participate in SouthRail's acquisition proceeding. This participation, in turn, would bring the transaction under section 11343(a)(5), which governs the "acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers." The unions rely upon the decisions in *Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957), and *United States v. Marshall Transp. Co.*, 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110 (1944).

However, the unions have never cited these cases before in these proceedings. Moreover, because they have not previously raised a claim based upon section 11343(a)(5), the ICC has made no ruling for this court to review regarding the applicability of that section to this case. Thus, because there are no exceptional circumstances excusing the unions' failure to raise this issue below, it is not before us on appeal. *See Black v. ICC*, 762 F.2d 106, 115 n. 17 (D.C.Cir.1985) (failure to raise section 11343(a)(5) claim before ICC removes issue from appellate review); *Hix v. Director, OWCP*, 824 F.2d 526, 527 (6th

Cir.1987) (well-established practice of appellate courts to refuse to consider claims not first presented to the agency below); *see also Pinney Dock and Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988); *Railway Labor Executives' Ass'n v. United States*, 791 F.2d 994, 1000–01 (2d Cir.1986).

### B.

■ An entity may invoke a section 10901 class exemption if it is a noncarrier and an independent corporate entity that was not created merely to avoid protective labor conditions. *See Class Exemption Case.* The unions argue that SouthRail fails to satisfy any of these criteria.

The unions first argue that SouthRail should be deemed to be a carrier because it is not an independent corporate entity, but the alter ego of its noncarrier parent. They insist that *Marshall* and *Alleghany* compel the ICC to ignore the integrity of corporate organizations and conclude that all controlled subsidiaries are, by their nature, not independent entities but integral parts of their controlling holding companies. We cannot agree.

We note that SouthRail controls no rail lines other than GMR's, and operated none before it acquired GMR. Indeed, it did not exist before it was created to acquire and operate GMR. Thus, the unions' ability to characterize SouthRail as a carrier lies in the persuasiveness of their argument that controlled subsidiaries are by definition the alter ego of their controlling holding companies.

We find the unions' arguments to be completely contrary to contemporary notions of business associations, in that they ignore the distinction between being controlled by a holding company and being an integral part of the holding company. For example, in *Rio Grande Indus., Inc.—Purchase and Related Trackage Rights—Soo Line Railroad Co. Line*, No. 31505 (I.C.C. November 15, 1989), the holding company established a new subsidiary for the purpose of acquiring carriers that other subsidiaries would then operate. The ICC ruled

that the new subsidiary was an integral part of the holding company, as it had no function other than to perform as the holding company's acquisition organ. *Id.* at 4. Compare *Railway Labor Executives' Ass'n*, 791 F.2d at 997, where the holding company established a new subsidiary to acquire and operate a carrier. The ICC found that the subsidiary was an independent corporate entity, in part because it had assumed the risks of the venture. *Id.* at 998–99. The ICC also found that the parents' creation of an independent subsidiary "to insulate itself from all other risks associated with [the] venture constitutes sound business practice with which we will not interfere." *Id.* at 999.

Any relevance that *Marshall* and *Alleghany* have to this issue lies in their holdings that require the ICC to review each proposed transaction on a case-by-case basis to evaluate the nature of the relationships between the parties. Though *Marshall* and *Alleghany* dealt only with the relationship between the parent holding company and the carrier that its subsidiary carrier was acquiring, another of the relationships that the ICC must review is that between parent and subsidiary.

In finding SouthRail to be an independent corporate entity, the ICC found it significant that SouthRail had assumed nearly all of the financial risks and obligations involved in the GMR acquisition and that its performance was not guaranteed by its parent holding company. Specifically, SouthRail assumed various loans and notes from GMR that amounted to more than $13 million, and it borrowed or generated most of the capital to finance the takeover itself. SouthRail did borrow $2 million from MSRC, and MidSouth agreed to be the primary obligor on GMR promissory notes to G.E. up to $1 million. The ICC concluded, however, that in the context of the entire transaction, MidSouth played a "relatively small part" in funding the takeover. The ICC also found it significant that SouthRail would operate the GMR line itself, publishing its own tariffs, hiring its own employees and engaging in financial

and contractual obligations in its own name.

The unions accuse the ICC of exalting corporate form over substance and failing to look past the corporate shells in this case. This attack upon the commission's analysis is groundless. The unions also acknowledge that MidSouth created South-Rail to insulate itself from the financial risks involved in the GMR acquisition. They argue that MidSouth would not lose the corporate protection of a subsidiary if the ICC determined that for purposes of section 11343, SouthRail was not an independent entity. This argument is irrelevant and based upon the speculation that the ICC's decision to pierce the corporate shield would have no res judicata effect in any other proceedings.

We agree with the ICC that where a holding company establishes a subsidiary to acquire and operate a carrier as an ongoing enterprise, and where the subsidiary assumes the financial risks of its operations, the subsidiary is not necessarily an alter ego of the holding company but may be, based upon the facts of the case, an independent corporate entity. We conclude that the ICC's consideration of the facts in this case was exhaustive, and its findings are neither arbitrary nor an abuse of discretion, and thus are supported by substantial evidence. We therefore uphold the Commission's conclusion that SouthRail is a noncarrier and an independent corporate entity.

The unions next attack the ICC's conclusion that SouthRail was not created merely to avoid the cost of protective labor conditions under section 11343. The unions point to the provisions in the acquisition agreement that allows SouthRail to cancel the deal if it cannot obtain a section 10901 class exemption and avoid protective labor conditions. The unions assert that these escape provisions demonstrate the parties' intent to avoid protective labor conditions. SouthRail explained to the Commission that the escape provisions were included because it could not have afforded to buy GMR if it had to pay the costs of labor protection.

The ICC found this explanation was plausible and that it did not detract from the legitimate business practice of using independent subsidiaries to guard against risks and liabilities. The ICC also found it reasonable that "labor protection costs were a material economic consideration to both sides." J.A. 18. This finding is neither arbitrary nor an abuse of discretion, and is supported by substantial evidence. Therefore, we uphold it.

III.

In attempting to bring this transaction within the purview of section 11343(a)(5), the unions insist that the ICC's adjudication of SouthRail's acquisition of GMR was defective because it did not include the issue of MidSouth's acquisition of control over GMR through its subsidiary. However, the union failed to raise this issue before the ICC, and, therefore, we will not consider its section 11343(a)(5) claims raised for the first time in this appeal.

We conclude that the ICC properly looked past the corporate shells to the underlying relationships between the companies involved in this transaction, and properly determined that MidSouth formed SouthRail for the legitimate business purpose of acquiring and operating GMR as an independent subsidiary. We further conclude that the ICC properly determined that SouthRail was entitled to invoke a section 10901 class exemption for its acquisition of GMR. Accordingly, for the foregoing reasons, we AFFIRM the ICC's decision and the unions' petitions for review are DENIED.