*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0066p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

CITY OF RIVERVIEW (03-4174); CITY OF TRENTON (03-4198); COUNTY OF WAYNE (03-4206),

*Petitioners,*

*v.*

SURFACE TRANSPORTATION BOARD; UNITED STATES OF AMERICA,

*Respondents,*

RIVERVIEW TRENTON RAILROAD COMPANY,

*Intervenor.*

Nos. 03-4174/4198/4206

On Appeal from the Surface Transportation Board.
No. 34040.

Argued: December 9, 2004

Decided and Filed: February 10, 2005

Before: MERRITT, GIBBONS, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jayson J. Hall, PENTIUK, COUVREUR & KOBILJAL, Wyandotte, Michigan, Gary K. August, FINK, ZAUSMER & KAUFMAN, Farmington Hills, Michigan, for Petitioners. Cecelia H. Cannizzaro, SURFACE TRANSPORTATION BOARD, Washington, D.C., for Respondents. David H. Coburn, STEPTOE & JOHNSON LLP, Washington, D.C., for Intervenor. **ON BRIEF:** Jayson J. Hall, Kerry L. Morgan, Randall A. Pentiuk, PENTIUK, COUVREUR & KOBILJAL, Wyandotte, Michigan, Mark J. Zausmer, ZAUSMER, KAUFMAN, AUGUST & CALDWELL, Farmington Hills, Michigan, Wallace G. Long, HOWARD & HOWARD, P.C., Bloomfield Hills, Michigan, for Petitioners. Cecelia H. Cannizzaro, Evelyn G. Kitay, SURFACE TRANSPORTATION BOARD, Washington, D.C., for Respondents. David H. Coburn, Joseph W. Koegel, Jr., STEPTOE & JOHNSON LLP, Washington, D.C., for Intervenor. Perry H. Apelbaum, Gregory A. Barnes, Washington, D.C., for Amici Curiae.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Intervenor Riverview Trenton Railroad Company ("RTR") sought an exemption from the Surface Transportation Board ("Board") that would allow it to

1

operate an intermodal transportation facility on property located in the Cities of Trenton and Riverview and the County of Wayne in Michigan. The Board, a successor to the Interstate Commerce Commission, has exclusive jurisdiction over rail lines that are part of the interstate rail network. Under federal preemption, state and local governments may not condemn railroad property that is under the regulatory jurisdiction of the Board.

The local governments protested to the Board that RTR's proposal was a sham designed to prevent them from taking the property by eminent domain as part of their riverfront redevelopment plans. RTR's proposal was evaluated by the Board and underwent an environmental review pursuant to the National Environmental Policy Act's ("NEPA") requirements. 42 U.S.C. § 4321 *et seq.* Based on the Environmental Assessment ("EA") prepared under NEPA, the Board concluded that, as long as certain conditions were met, the project would have no significant impact on the human environment. It also concluded that RTR proposed a bona fide railroad and transportation facility. Petitioners appeal from the Board's decision. For the following reasons, we affirm the Board's decision.

I.

The parties contest the future development of a 76-acre property located in the cities of Trenton and Riverview, Michigan and along the Detroit River. The property was owned by a company called DSC between 1998 and 2000. During this time period, DSC discussed development of the site with officials from Trenton and Riverview and Wayne County. The cities and county wanted to acquire the land and convert the property to a public use such that the public would have improved access to this area and the area would become more aesthetically pleasing.

Before this occurred, however, DSC sold the property to Crown Enterprises. In November 2000, Crown formed a subsidiary, Riverview Trenton Railroad Company. RTR incorporated under the Michigan railroad corporation statutes. On November 27, 2000, Crown transferred the property to RTR via a quitclaim deed.

Over this same time period, the local governments realized that Crown would not sell the property to them. They therefore began investigating the possibility of taking the property under Michigan's Uniform Condemnation Procedures Act. The county's attorney, Mark Zausmer, sent a letter to Crown requesting information relevant to the proposed condemnation of the property. On December 11, 2000, Crown responded to Zausmer's letter by asking for a more specific description of the property at issue. Zausmer sent a legal description to Crown on December 29, 2000.

On January 5, 2001, RTR filed suit in the Eastern District of Michigan seeking to enjoin the county from pursuing its eminent domain efforts. The district court issued a preliminary injunction on April 10, 2001, holding that the county's efforts were preempted by the Board's exclusive jurisdiction over railroad activities under the Interstate Commerce Act.

RTR quickly began work on development of the property. It filed a Notice of Exemption with the Board describing its plans to create an intermodal transportation facility. Specifically, RTR planned to use tracks on the property to provide rail service; at that location, it would receive containerized freight from railroads and transfer it to trucks, and vice versa. The class exemption would allow RTR to operate as a Class III railroad (defined as a railroad earning less than $20.9 million a year). The Board published public notice of the exemption in the Federal Register in January 2001.

Thereafter, the cities of Riverview and Trenton and Wayne County filed separate petitions with the Board to revoke RTR's exemption. The cities and county argued that RTR was not entitled to the exemption it had sought and further that the property should be used for alternative purposes. They alleged

that RTR was not planning a legitimate rail operation but rather sought to prevent the local communities from taking the property through eminent domain procedures.

RTR filed a response. It said that the communities had made no effort to condemn the property until after Crown announced plans to use the property for rail operations. It further alleged that the communities' only interest was to keep out the proposed rail operations.

In February 2002, the Board disallowed RTR's use of the class exemption. The Board based its decision on the need for a more detailed review of the proposal.

While attempting to obtain a class exemption for its rail operations, RTR also sought an individual exemption in order "to put to rest any outstanding concerns that might exist about RTR's invocation of the class exemption procedure." Accompanying this petition was an environmental report, documenting the potential environmental effects of the project, which were anticipated to be minimal, and proposed mitigation efforts.

The Board undertook an environmental analysis of RTR's proposal under the procedures outlined in NEPA. The Board reviewed RTR's proposal and its environmental report, and asked for additional data on air quality, noise, environmental justice, cumulative effects, and transportation. RTR and its environmental consultant prepared a draft Environmental Assessment from this data. The Board reviewed the draft EA and issued it for public review on October 15, 2001. It concluded that RTR's proposal would have no significant impact on the area.

The Board sent copies of the EA to federal, state, and local government agencies. It also published a notice in the Federal Register advising the public that the EA was available for review and inviting comments. 66 Fed. Reg. 52,477 (Oct. 15, 2001).

The cities of Riverview and Trenton and Wayne County submitted comments on the EA. The Board responded to these comments in a Post-EA issued on January 22, 2002. In this document, the Board recommended that RTR undertake several mitigation measures to minimize the impact of the rail operations. If these mitigation measures were implemented, the Board concluded that there would be no significant environmental impact on the area.

After the Board issued the Post-EA, it held a public meeting in the area. Local officials and residents expressed opposition to the project during the meeting. These parties also expressed opposition in over 1700 letters sent to the Board after the meeting.

The Board responded to concerns raised at the meeting and in the letters by issuing a Supplemental Post-EA in August 2002. The Board proposed additional conditions upon RTR's operation and concluded that if the conditions were met, there would be no significant impact on the environment.

As well as undertaking environmental reviews, the Board also requested evidence about the public need for RTR's project and any specific plans of the local governments to take this property through eminent domain procedures. RTR submitted evidence showing that its rail operations would benefit a variety of transportation companies. Approximately fifty companies sent letters to the Board indicating that RTR's project would fill a need for an intermodal transportation facility. Three experts testified that the Detroit area needed an intermodal facility.

The local governments responded to the Board's request by arguing that the public interest "would be disserved by granting RTR's petition because it would divest local communities of the . . . authority they need to assure that the use of the property is consistent with their broader development plans." However, they admitted that they had just taken the preliminary steps of investigating the possibility of condemning the land and that the "County had not at that time and has not at this time decided to take this parcel."

In May 2003, the Board finally issued a decision regarding RTR's proposed operations. It found that RTR's proposal was bona fide, that the Detroit area had a need for an intermodal transportation facility, and that RTR would be able to meet this need. It also found that there would be no significant impact on the environment, assuming that RTR followed the required mitigation procedures outlined in the EA, Post-EA, and Supplemental Post-EA. The Board concluded that RTR should be allowed to proceed.

In order to alleviate the concerns of the local communities, the Board imposed a requirement that RTR report on its progress in implementing the project at regular intervals for three years. If RTR does not begin developing rail operations, the Board reserves the right to reopen the matter.

The local governments filed requests for reconsideration. The Board denied these requests. However, it did address an issue raised late in the administrative proceedings, which was the designation of the Detroit River as an American Heritage River. The Detroit River had received this designation by an Executive Order issued in 1998, well before proceedings before the Board had begun. The Board found that the designation did not require reconsidering the matter because the RTR proposal would have no adverse environmental impact on the Detroit River or its recreational resources and because the RTR proposal comported with the goal of economic revitalization advanced by the American Heritage Rivers Initiative.

Petitioners filed a timely notice of appeal in this court for review of the Board's decision.

## II.

The questions before us are whether the Board properly granted the company's request for an exemption in light of the claims of the local governments that: (1) RTR is simply trying to defeat efforts of the governments to acquire the property for recreational and non-industrial uses and is not proposing a bona fide common carrier rail use, and (2) in awarding the exemption, the Board violated its duties under NEPA, the Coastal Zone Management Act, and the American Heritage Rivers Executive Order.

This court's review of the Board's decision is narrow. *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 547 (6th Cir. 2002). Under the Administrative Procedure Act ("APA"), a reviewing court must uphold an agency's findings and conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, . . . [or] unsupported by substantial evidence." 5 U.S.C. § 706(2). In assessing whether a decision is arbitrary or capricious, the court must consider if there was a "rational connection between the facts found and the choice made." *Film Transit, Inc. v. ICC*, 699 F.2d 298, 300 (6th Cir. 1983). A decision is not arbitrary or capricious if "it is possible to offer a reasoned, evidence-based explanation for a particular outcome." *R.R. Ventures, Inc.*, 299 F.3d at 548. A decision is supported by substantial evidence if there is "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 818 (6th Cir. 1998).

## III.

The cities and county assert that the Board erred in approving RTR's application to operate as a common carrier because, they allege, RTR merely wanted to prevent eminent domain proceedings from advancing. The Board found that "based on careful consideration of the entire record, this is a legitimate rail transportation project, which should be allowed to go forward." It observed that "RTR has developed specific plans for constructing an intermodal facility for which there is evidence of a current demand . . . [and] taken reasonable steps to prepare for the commencement of rail operations." Further, RTR "has submitted statements from shippers supporting its project."

The Board's decision to grant RTR an individual exemption was not arbitrary or irrational. The record before it provided sufficient evidence for it to conclude that RTR proposes a legitimate operation. RTR developed specific plans to create its railroad operations. In June 2000, it purchased a railway

easement for "rail ingress and egress to and from the Crown Parcel." It also hired an engineering firm "to evaluate the suitability of the proposed site of the RTR[ ] shortline and intermodal facility in the Detroit area and to design the track layout within the facility." The engineering firm prepared a "feasibility engineering review and layout" of the operations. Further, RTR hired URS Corporation to prepare an environmental report on the effects of its proposal for submission to the Board.

Along with undertaking these preliminary steps, RTR submitted a significant amount of information in support of its proposal. For example, it submitted a detailed environmental report, documenting the potential environmental effects of the project and proposed mitigation efforts. It also submitted evidence showing that its rail operations would benefit various types of transportation companies. Approximately fifty companies sent letters to the Board indicating that RTR's project would fill a need for an intermodal transportation facility. Three experts testified that the Detroit area needed an intermodal facility.

Thus, the Board had before it substantial evidence that RTR had taken the preliminary steps necessary to establish its facility and that there was a need in the area for such a facility. Given this evidence, it was rational for the Board to conclude that RTR proposed a bona fide rail operation. In our opinion, these findings are not arbitrary or irrational in violation of the requirements of the APA, 5 U.S.C. § 701 *et seq.*

Petitioners rely on the Board's decision in *Jefferson Terminal Railroad Company* as evidence that RTR sought an exemption only to prevent condemnation proceedings from advancing. *Jefferson Terminal Railroad Co. – Acquisition and Operation Exemption – Crown Enterprises, Inc.*, STB Finance Docket No. 33950 (March 19, 2001). In *Jefferson Terminal*, Jefferson, a subsidiary of Crown Enterprises,[1] invoked class exemption procedures to acquire and operate 1.2 miles of rail line in Detroit. At the time Jefferson filed its notice with the Board, Detroit had already initiated condemnation proceedings. Jefferson did not indicate to the Board that there was an ongoing condemnation action. The Board revoked Jefferson's class exemption, because it felt that "a more searching process" under a petition for an individual exemption or a full application was necessary. In so doing, the Board stated that it was "troubled by Jefferson's failure to disclose that the property was about to be condemned." In the Board's view, Jefferson's failure to mention this fact bolstered the "City's allegation that the proposal that Jefferson submitted to this Board was merely a device to acquire or retain property for non-rail purposes using federal preemption as a shield."

*Jefferson*, however, does not require us to find that the Board's decision that RTR proposed a legitimate operation was arbitrary or capricious. Unlike in *Jefferson*, the Board here was well aware that the local governments were considering condemnation proceedings on this property. In its decision granting an individual exemption, the Board recognized that "the County and the local communities have a different vision for this property than RTR." More specifically, in its earlier decision denying a class exemption, the Board explicitly acknowledged the concerns of the local governments that RTR was seeking an exemption to prevent eminent domain proceedings from commencing. In that decision, the Board stated:

> Wayne County and the other opponents claim that RTR's proposal is merely an attempt to preclude the condemnation of some or all of the involved property for public purposes. To date, no evidence has been submitted that shows with any specificity what property may be condemned, who would condemn it, under what authority, and for what specific purpose. Nor has Wayne County or any other public body submitted any timetable for condemnation.

Thus, it is clear that the Board was cognizant of the local governments' concerns when it reached its decision that RTR proposed a bona fide railroad operation.

---

[1] Crown Enterprises is also the parent company of RTR.

Further, unlike in *Jefferson*, the local governments had not commenced condemnation proceedings by the time RTR requested an exemption from the Board. The local governments admitted that they had just taken the preliminary steps of investigating the possibility of condemning the land and that the "County had not at that time and has not at this time decided to take this parcel."

We agree with the Board that the *Jefferson Terminal* case is different from the present case and does not overcome the Board's conclusion that RTR's proposal is made in good faith.[2]

Finally, the Board's decision to require RTR to report on its progress in implementing its proposal ensures that RTR will not be able to use the Board's exemption to permanently shield the property from a condemnation action. If RTR does not begin work on its rail operations, the Board reserves the right to reopen the matter. Because the Board will periodically monitor RTR's progress, there is little concern that the Board's authority will be misused in order to insulate the property from the local governments should the railroad operation fail to progress.

## IV.

### A.  The National Environmental Policy Act

NEPA requires federal agencies to consider the environmental effects of federal actions. 42 U.S.C. § 4321 *et seq*. It "sets forth essentially procedural requirements to assess environmental impacts of major federal actions." *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 414 (6th Cir. 2004). The Board, through its environmental staff, prepared an environmental assessment that was reviewed and approved in its opinion granting an exemption to RTR. The local governments contest a number of the Board's conclusions.

First, they complain that the Board did not assess the environmental impact of adding river barge service at RTR's terminal, a long-range possibility for which RTR had not developed specific plans. The Board concluded that the potential effects of a water service terminal on the Detroit River were too speculative and would be examined in the future by the Corps of Engineers prior to construction and operation. We agree that the possibility is too speculative at present. As the Supreme Court observed in *Kleppe v. Sierra Club*, NEPA "speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions." 427 U.S. 390, 410 n.20 (1976). RTR's consideration of adding barge traffic to its intermodal facility is not a proposed action, but rather a less imminent action that may or may not occur. Further, it does not appear that RTR has any developed plans for implementing a proposal on barge traffic. Without some details as to the amount of barge traffic contemplated or the nature of the pier or dock to be built, any environmental analysis would be based solely on conjecture. *See Crounse Corp. v. ICC*, 781 F.2d 1176, 1195 (6th Cir. 1986) (rejecting contention that NEPA requires review of contemplated changes, because such proposals "have [not] been developed to a point where more meaningful environmental analysis of these proposals is possible").

This same reasoning applies to the possibility raised by the local governments that RTR may buy additional acreage in the future and enlarge its facility. The record before the Board showed no current plans to acquire additional property. Nor is there any evidence suggesting that RTR has plans to expand its operations. Thus, any environmental analysis would be based on speculation about how much property might be acquired and what development might occur on such property. The Board reasonably declined to evaluate RTR's potential purchase of additional land. *See id.* at 1194 (holding that NEPA does not require review of contemplated changes).

---

[2]*Jefferson* and this case also differ in that *Jefferson* was a decision about a class exemption. The Board did not decide that Jefferson could never operate a railroad in reaching its decision; rather, it concluded that a more searching process, such as that undertaken with an individual exemption, would be more appropriate.

With respect to petitioners' contention that the Board erred in failing to consider the straightening and elevation or outright relocation of the area's major thoroughfare, we find that any plans to change Jefferson Avenue are speculative. Further, any potential changes to this street would require the consent of local governmental authorities. The Board was not required to consider this possibility in its review of RTR's proposal.

We also do not find that there is an adequate basis for Riverview's objections concerning air quality. Riverview objects to the finding that air quality would be improved by relying more heavily on rail transportation rather than trucks, but the record fairly explains the factual basis for this trade-off. The record contains a study by the Michigan Department of Transportation that showed that such an intermodal facility would produce a 50 percent reduction in carbon monoxide, particulate matter, and other emissions. It appears that the Board fully evaluated air quality effects and reached reasonable conclusions.

The same is true of the Board's evaluation of the facility's impact on noise levels in the area. Expected noise levels were examined in detail, and the Board found that noise levels would remain low. Additionally, in order to mitigate any potential damage from increased noise levels, the Board imposed a landscaping condition requiring berms and vegetation and a condition restricting the hours of operation.

Finally, Riverview complains about the possibility that the additional train traffic will cause traffic problems and delay emergency vehicles' response times. The record reflects that the Board extensively considered how the RTR facility would affect local transportation and emergency response providers. The EA upon which it relied concluded that, while delays could be possible when RTR uses its rail connection at the north end of its property, alternate routes exist and most of the time RTR would use the rail crossing at the south end of its property. The Board imposed a condition on RTR that requires it to provide two hours notice to emergency response providers prior to using the crossing at the north end of the property. Thus, the Board's decision with respect to emergency response providers and transportation issues reflects that it undertook the requisite hard look mandated by NEPA and, from that analysis, reached a reasonable decision. *See Kleppe*, 427 U.S. at 410 n.21 (NEPA requires only that the court "insure that the agency has taken a 'hard look' at environmental consequences").

### B.  Coastal Zone Management Act

Because RTR's proposed facility borders the Detroit River, the Coastal Zone Management Act, ("CZMA"), 16 U.S.C. § 1451 *et seq.*, applies. The CZMA was enacted to

> encourage the states to exercise their full authority over the lands and waters in the coastal zone by assisting the states, in cooperation with Federal and local governments and other vitally affected interests, in developing land and water use programs for the coastal zone, including unified policies, criteria, standards, methods, and processes for dealing with land and water use decisions of more than local significance.

*Id.* § 1451(i).

Petitioners contend that the Board did not give notice to the state agency as it was required to do under its rules implementing the CZMA. They also admit that they did not raise this issue before the agency and that "this deficiency [the alleged failure to comply with the CZMA] was only recently discovered."

It is well-established that this court generally will not hear issues raised for the first time on appeal. *See Bhd. of Locomotive Eng'rs v. ICC*, 909 F.2d 909, 912 (6th Cir. 1990) (observing that, because an issue was not raised before the agency, there is "no ruling for this court to review" and thus the court will not hear the issue); *Hix v. Dir., Office of Worker's Comp. Programs*, 824 F.2d 526, 527 (6th Cir. 1987) ("[A] court should not consider an argument that has not been raised in the agency proceeding that preceded the appeal."). Petitioners had multiple opportunities to object to the alleged failure to comply with the CZMA's

requirements before the Board. The Board solicited comments from local governments, invited comments on the EA from the public, heard citizens' concerns in a public meeting in the project area, and considered the governments' requests for agency reconsideration. Not once did petitioners discuss the CZMA's requirements in their communications with the Board. Thus, because they wholly failed to raise this issue below, we conclude that this issue was waived.

### C. American Heritage Rivers Executive Order

President Clinton created the American Heritage Rivers Initiative to "protect and restore rivers and their adjacent communities." Exec. Order No. 13,061, 62 Fed. Reg. 48,445 (Sept. 15, 1997), *amended by* Exec. Order 13,093, 63 Fed. Reg. 40,357 (July 27, 1998). Under this initiative, "communities . . . nominate rivers as American Heritage Rivers and the Federal Role [is] solely to support community-based efforts to preserve, protect, and restore these rivers and their [adjacent] communities." *Id.* at 48,445. The Executive Order directs agencies to "ensure that their actions have a positive effect on the natural, historic, economic, and cultural resources of American Heritage River communities." *Id.* at 48,446. It requires agencies to "consult with American Heritage River communities early in the planning stages of Federal actions, take into account the communities' goals and objectives and ensure that actions are compatible with the overall character of these communities." *Id.* The Detroit River has been designated an American Heritage River. Proclamation No. 7112, 63 Fed. Reg. 41,949 (July 30, 1998).

Petitioners argue that the Board did not fully consider the effect of RTR's proposal on the Detroit River, in contravention of the American Heritage Rivers Initiative. Further, they contend that the Board ignored "the substantial record of the public's overwhelming desire to restore and redevelop the riverfront for the benefit of the entire community."

Petitioners, however, cannot state a claim against the Board under the American Heritage Rivers Initiative. The Executive Order specifically states that it "does not create any right or benefit, substantive or procedural, enforceable by any party" against agencies. 62 Fed. Reg. at 48,448. Thus, this court cannot review whether the Board's actions violated the Executive Order, because it does not create a right of action against the Board.

Recognizing that the Executive Order limits judicial review of the Board's action under this initiative, petitioners argue that the Board's actions in ignoring the initiative evidence that the Board did not undertake a sufficient review under NEPA. However, the EA encompassed a review of the effect of RTR's proposal on water resources, including water quality of the Detroit River, groundwater, and wetlands. Further, the Board concluded in its EA and Post-EA that "the RTR proposal would not have adverse impacts on water resources or on access to resources along the Detroit River." It also "determined that RTR's use of the property would not alter the historic commercial use of the property." As the Board explained, the Executive Order does not restrict such projects in river areas that are heavily industrialized, such as the area in which RTR will build its facility, but allows economic revitalization in these areas. We thus find no reversible error in the Board's review of this issue.

### V.

For the foregoing reasons, we affirm the Board's decision to grant an individual exemption to RTR.